**Affirmed and Memorandum Opinion filed January 7, 2020.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00549-CV

## IN THE INTEREST OF A.K.C.K., A CHILD

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2002-02794J**

## NO. 14-19-00551-CV

## IN THE INTEREST OF I.G.K., A CHILD

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-05186J**

## MEMORANDUM  OPINION

In these accelerated appeals, a mother seeks reversal of the trial court's final decrees terminating her parental rights to her two daughters. She challenges the

legal and factual sufficiency of the evidence to support the trial court's findings on one predicate termination ground and its finding that termination of her parental rights is in the best interest of the children. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

T.D.F. ("Mother") and C.K. ("Father") are the natural parents of A.K.C.K. ("Anne") and I.G.K. ("Iris"), the two children at the center of this termination suit.[1] At the time of trial, Anne was seventeen years old, and Iris was fifteen years old. The trial court terminated both Mother's and Father's parental rights to their children. Father has not appealed.

Anne and Iris were both living with Mother's eldest child "Diane" at the time of trial. Anne previously had been living with a foster family. At trial, the trial court preadmitted the appointed child advocate team leader's report and the Texas Department of Family and Protective Service's permanency report. The team leader recommended terminating Mother's parental rights because of (1) her long history with the Department, beginning in 1991 regarding her care of Diane; (2) her failure to participate in the family service plan; (3) allegations of emotional abuse and physical neglect of both Anne and Iris; and (4) the girls' success in their current placement with their older half-sister. Specifically, the report states that both girls are very happy with Diane and that Diane would like to adopt them. According to the report, "[Diane] has been very involved in the girls' care, is very pleased to have them in her home and a part of their family." Diane recently moved into a larger home to provide more space for the girls. Anne is thriving in school and beginning the college search process. Iris has shown increased confidence and improved grades since moving in with her sisters.

---

[1] We use pseudonyms to refer to appellant, the children, and other family members. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

Mother testified that this investigation was the result of a retaliation effort by Anne's foster parents. Mother explained they were angry she had unenrolled Anne from her high school. Mother said Anne split her time evenly between the foster family and her own home. The foster family lived in the district where Anne attended school. The foster family also provided financial support for Anne. Mother testified that the family did not want Iris, only Anne.

Mother denied that she ever has had any mental health issues. Mother said she never has been prescribed medication for her mental health. She confirmed that she has undergone mental health evaluations as a part of the Department's investigation.

Mother maintained that the foster family was "framing" her. When asked about the prior Department investigations, Mother said that "people just randomly like to use CPS [Children's Protective Services] as a revenge and they just call, make false calls." Mother confirmed that she has warned her children about a person she used to date who is on trial for being a witch because this person may be a danger to their family.

Mother testified that she did not believe Anne and Iris were getting all their needs met in Diane's home because they need their mother. When asked whether she was aware that the girls requested not to have visitation with her, Mother said she believed that was not true and that the whole case was a conspiracy. Mother further confirmed that she had given the caseworker photos of women whom Mother believed were practicing witchcraft to harm her and her family. Mother testified that a family meeting with the Department and the foster family was staged by the foster parents and the Department "to have [Anne] have her way, or the godparents have their way."

Demetrias Byrd, the Department's conservatorship worker, testified that the

girls are doing "great" in their placement with Diane. Iris, who had previously struggled with school, had achieved "A and B" honor roll and increased self-confidence since moving into Diane's home. According to Byrd, Diane always has wanted to adopt the girls, but was just waiting for the girls to come around on their own. Byrd testified that when the case began, both girls were very sad, confused, and felt displaced. The girls benefitted from the court order directing that they have no visitation with Mother. Without Mother in their lives, the sisters were able to have a routine and stability without fear that Mother would interrupt. Byrd believes that the girls "kind of found themselves throughout this case." Anne has her eyes set on college within the next few years, and Iris is also beginning to think about college.

Byrd testified that Mother had not complied with her service plan. Specifically, Mother had not complied with the psychiatric portion or provided proof of housing. Byrd explained that the Department is concerned because Mother takes no responsibility for her actions. Mother cites the foster parents and "witchcraft" as the reasons for her daughters being removed from her care. Byrd testified that she attempted to obtain Mother's medical records but Mother would call the providers and "curse[] them out." Mother threatened to sue the providers if they shared her medical information. The providers informed Byrd that they did not want to get involved. When asked to describe Mother's behavior throughout the course of the case, Byrd responded, "hostile, belligerent, aggressive to me, every worker, every provider, not pleasant." Byrd further testified that Mother had been hostile and aggressive to Anne during the investigation.

The court appointed child advocate team leader from Child Advocates testified that she had been involved with this family since 2008 and that there was no visitation in this case because of Mother's erratic behavior, including

4

threatening behavior toward caseworkers and a hostile email sent to Anne in 2017. According to the team leader, Child Advocates recommended terminating Mother's parental rights so that the girls may be adopted by Diane. The team leader explained that Mother has not shown she can provide a safe or stable environment for Anne or Iris.

The team leader also testified that Mother had acted erratically towards her agency, specifically stating:

> [She] called my volunteer several names. She sent several threatening emails to our organization on our website as well as personal emails to the volunteer and CC'd her attorney and them, telling us not to contact her, telling us that we're liars and that we're going to pay for what we've done, that we're part of the witchcraft that the caseworker and the ad litem has participated in — just a bunch of erratic angry emails that are very concerning.

The team leader further explained that Mother's emails are abusive and full of profane language.

According to the team leader, the girls have greatly improved since moving into Diane's care. Anne has continued to thrive in school, and Iris has made a remarkable turn-around and is also excelling in school. Both girls have told the team leader that they would like to be adopted by their sister Diane. According to the team leader, Anne lives in continual fear that Mother will come back for her like she used to do with the foster family. Child Advocates concluded that termination of Mother's parental rights would give Anne and Iris greater stability through adoption.

The trial court signed two orders terminating Mother's parental rights to each child with a finding by clear and convincing evidence that Mother endangered the children and failed to comply with the court ordered service plan and it would be in each child's best interest to terminate Mother's parental rights.

## II. Issues and Analysis

Parental rights can be terminated upon proof by clear and convincing evidence that the parent has committed an act prohibited by section 161.001(b)(1) of the Family Code and termination is in the best interest of the child. Tex. Fam. Code § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In her brief on appeal, Mother concedes the record contains adequate evidence to support the trial court's finding that she did not comply with her family service plan in accordance with the statute. Tex. Fam. Code § 161.001(b)(1)(O). However, Mother requests that we review the trial court's endangerment finding for legal and factual sufficiency. *Id*. § 161.001(b)(1)(E). Although only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the children's best interest, Mother is entitled to a review of the endangerment finding under subsection (E) because of the collateral consequences of such a finding. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) ("When a parent [challenges an endangerment finding], an appellate court that denies review of [such] a . . . finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children."). Mother further argues that the evidence is legally and factually insufficient to support the best-interest finding.

### A. Standard of Review

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96

S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental-termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344. We presume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all contrary evidence that a reasonable factfinder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Yet, applying this standard does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear andconvincing burden, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

**B. Endangerment Under Subsection (E)**

In reviewing a subsection (E) finding, we are mindful of the requirement that Mother's appeal be meaningful and that we detail our analysis of the sufficiency of the evidence supporting the finding. *In re P.W.*, 579 S.W.3d 713, 725 (Tex. App.—Houston [14th Dist.] 2019, no pet.). In making the finding, the trial court found that Mother engaged in conduct or knowingly placed Anne and Iris with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). A finding of endangerment under subsection (E) requires evidence that the endangerment resulted from the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination of the parent-child relationship under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

While endangerment often involves physical danger, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's wellbeing may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

The Department's caseworker testified that Mother's behavior has been hostile, belligerent, and aggressive. The child advocate team leader testified that Mother had demonstrated angry and erratic behavior over the course of the last ten

8

years since the team leader had been assigned to this family.

The team leader's report and the Department's report admitted at trial contain multiple instances of Mother's unstable and threatening behavior. Anne had attempted suicide. While in Mother's care, Iris was not going to school consistently and was behind academically. Iris said since being placed with Diane, this is "the best life she has ever had." The girls have shown marked turn-arounds and are thriving and succeeding in school since visitation with Mother has ceased.

Mother's own testimony was erratic and lacked any showing of responsibility on Mother's part for her daughters' suffering. Mother has been under investigation by the Department since 1991 but testified that she believes this case is the result of false allegations by Anne's foster parents and witchcraft. Mother admitted to sharing her belief that a witch had put a hex on the family with her teenage daughters.

Considering all the evidence in the light most favorable to the (E) finding, presuming the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved, being mindful of any undisputed evidence contrary to the finding, and considering that evidence in our analysis, we conclude that a reasonable factfinder could form a firm belief or conviction that Mother engaged in conduct that endangered the physical or emotional well-being of the children. *See* Tex. Fam. Code § 161.001(b)(1)(E); *In re A.L.H.*, 515 S.W.3d at 92-93 (considering Father's unusual behavior indicating untreated mental illness as supporting an endangerment finding). Likewise, viewing the entire record, we conclude the disputed evidence is not so significant as to have prevented the trial court from forming a firm belief or conviction that termination was warranted under subsection (E). Accordingly, we conclude the evidence is legally and

9

factually sufficient to support the 161.001(b)(1)(E) finding.

## C. Best Interest of the Children

Texas courts presume that keeping a child with her natural parent serves her best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of the best-interest issue. *See In re S.R.*, 452 S.W.3d at 366.

The considerations the trier of fact may use to determine the best interest of each child, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future emotional and physical danger to the child;

(4) the parental abilities of the persons seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the child;

(6) the plans for the children by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the children with a safe environment). A finding in support of "best interest" neither requires proof of any unique set of factors nor limits proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

### 1. The desires of the children

Since the trial court issued a no-visitation order, the girls have not requested to see Mother. Anne had attempted suicide due to Mother's mistreatment. But she has been thriving since being placed with her older sister. Iris's self-confidence has increased, and she is improving in school since being placed with Diane. In the report from Child Advocates admitted into evidence at trial, Iris described her life in Diane's home as "the best life she has ever had." Byrd testified that both sisters desire to be adopted by Diane because "they want to maintain the stability they've gained while being in the placement with her."

This factor weighs strongly in favor of the trial court's finding.

### 2. The stability of the home or proposed placement

Texas courts recognize as a paramount consideration in the best-interest determination the children's need for a "stable, permanent home." *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the children is relevant to the best-interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

In Diane's care, the girls are secure in a home together with their older sister and her family. Both girls are very happy to be back together and are thriving in their current placement with Diane. Diane recently moved to a larger home, so the girls have more space.

This factor weighs strongly in favor the trial court's finding.

### 3. The plans for the children by the individuals or agency seeking custody

Anne wants to attend college and has attained educational and social achievements which warrant this goal. According to the testimony of the child

11

advocate team leader and the Department caseworker, Diane supports this goal. Iris, who struggled academically while in Mother' care due to missing so much school, made the "A and B" honor roll after coming into Diane's care. Iris wants to follow in Anne's footsteps and attend college. It is reasonable to presume Diane would support this goal for Iris just as she does for Anne.

This factor weighs strongly in favor of the trial court's finding.

### 4. The present and future emotional and physical danger to the children

As already discussed, the evidence supports the trial court's finding that Mother engaged in conduct that endangered the physical or emotional well-being of the children. Evidence supporting termination under the grounds listed in section 161.001(b)(1) also can be considered in support of a finding that termination is in the best interest of the children. *See In re C.H.*, 89 S.W.3d at 28. Furthermore, a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re A.J.E.M.-B.*, No.14-14-00424-CV, 2014 WL 5795484 at *16 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.).

This factor supports the trial court's finding.

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in the children's best interest.

### III. CONCLUSION

Having concluded the evidence is legally and factually sufficient to support the trial court's finding terminating Mother's parental rights under section 161.001(b)(1)(E) and that termination is in the children's best interest, we conclude

that the record evidence supports the trial court's judgment. We affirm the judgment of the trial court.

/s/    Frances Bourliot
       Justice

Panel consists of Chief Justice Frost and Justices Christopher and Bourliot.